Filed 9/14/16  J.F. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| J.F.,<br><br>    Petitioner<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G053597<br><br>(Super. Ct. No. DP026541-001)<br><br>O P I N I O N |

        Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Dennis J. Keough, Judge. Petition granted.

Sharon Petrosino, Public Defender, Laura Jose, Assistant Public Defender, Robyn L. Silva and Dennis M. Nolan, Deputy Public Defenders for Petitioner.

No appearance for Respondent.

Law Offices of Harold LaFlamme and Linh Redhead for minor.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre Deputy County Counsel for Real Party in Interest Orange County Social Services Agency.

\*                \*                \*

Mother's petition for writ of mandate arises from an order terminating reunification services and setting a Welfare & Institutions Code section 366.26 hearing (.26 hearing).[1] Mother was offered reunification services for six months. For the first three months, her participation in her case plan was minimal. For the last three months, it was excellent. Nonetheless, the court terminated reunification services, finding mother had "failed to participate regularly and make substantive progress" in her case plan. (§ 366.21, subd. (e)(3).) We conclude that finding is not supported by substantial evidence and thus we will issue the requested writ of mandate.

FACTS

*Allegations of the Petition*

In late August 2015, the Orange County Social Services Agency (SSA) filed a dependency petition regarding minor, who was about one month shy of his third birthday. The petition alleged minor came within the jurisdiction of the court pursuant to

---

[1] All statutory references are to the Welfare & Institutions Code unless otherwise stated.

section 300, subdivisions (b) (failure to protect) and (g) (no provision for support due to parental incarceration).

The petition alleged that in late July 2015, minor sustained a cut to his finger from a broken beer bottle while he was playing in the flat bed of a pickup truck at the family home. Mother, who was alerted to the injury when the child screamed, took minor to the emergency room. While at the emergency room, minor was observed to have red sores and pustules around his genitals and buttocks. Also, mother reported that she had not taken minor for any well checks since he was one month old, and that minor had not received any vaccinations.

The petition alleged that mother had unresolved anger management issues. In 2013 mother was convicted for domestic violence arising from an incident in which she had struck her ex-husband in the head five times and struck his vehicle repeatedly with a metal stick. In early July 2015, mother fought with her sister Olga, who lives in the same house.

The petition also alleged that mother had an unresolved substance abuse problem; a history of methamphetamine use. She reportedly had last used methamphetamine approximately two weeks prior to the incident in which minor cut his finger. Mother's probation officer reported that mother was not enrolled in a drug treatment program, had multiple positive drug tests, and was not attending Narcotics Anonymous meetings. Mother's criminal history included spousal battery (Pen. Code, § 243, subd. (e)(1)), vandalism (Pen. Code, § 594, subd. (a)-(b)(1)), and drug possession offenses (Health & Saf. Code, §§ 11351, 11377, subd. (a)). Minor's father had an even more extensive criminal history, and his whereabouts were unknown.

*Background Facts*

Mother first tried methamphetamine at age 14 and began using on a daily basis. Six months later she met the father of her first two children, at which point she

3

stopped using.  She became pregnant with her first child at the age of 15.  Approximately two years later, mother began using methamphetamine again approximately every other weekend.  One of mother's sisters was incarcerated around this time, and mother began caring not only for her own children, but her incarcerated sister's children as well.  In 2010, that sister died.  Mother increased her methamphetamine use to every weekend.  In 2013 mother separated from the father of her first two children, at which point she began daily methamphetamine use.  Mother met minor's father shortly thereafter and became pregnant with minor.

At that time, mother moved in with her mother and sister Olga.  The occupants of the home included mother, minor, her nephew from her deceased sister (over whom mother was a legal guardian), her mother (minor's grandmother), her grandmother, her sister Olga, and Olga's three children.  The father of mother's two oldest children had primary custody of them, though they often visited mother during the day and overnight.  Mother reported that she and her four children (minor, the nephew from the deceased sister, and minor's two half siblings) slept in the garage of the home.

In July 2013, mother was convicted of misdemeanor spousal battery (Pen. Code, § 243, subd. (e)(1)).  She had punched the father of her first two children in the head several times when he refused to tell her when he was going to return the children.  He then got into his car; mother retrieved a metal rod and began striking his car, leaving dents.  Mother was sentenced to three years' probation, which included as a condition that mother complete a batterer's treatment program.  (See Pen. Code, § 34, subd. (e)(1) ["If probation is granted, or the execution or imposition of the sentence is suspended, it shall be a condition thereof that the defendant participate in, for no less than one year, and successfully complete, a batterer's treatment program"].)

In June 2014, mother was convicted on felony drug possession charges (which were later reduced to misdemeanors) for which she was sentenced to three years' probation and 180 days in jail.  While in jail, mother took several classes, including

4

Narcotics Anonymous, parenting classes, and substance abuse classes. When mother was asked why these classes "didn't work" (i.e. she began using methamphetamine again after release), she stated, "I honestly did take a lot of what I learned to use out there, and it . . . did help me. But then . . . I got released August 5th, and my dad passed away [as a result of alcoholism] August 8th, so that was really hard for me to deal with."

In March 2015, mother served 90 days in jail as a result of a probation violation — she failed to enroll in the court-ordered batterer's treatment program.

In June 2015, mother noticed what looked like a bug bite on minor. The rash worsened, so mother took minor to Children's Hospital of Orange County (CHOC) and was prescribed a liquid antibiotic. The rash went away, but returned one week later. This brings us to the events described in the petition.

When minor cut his finger, mother took him to the emergency room at CHOC. Regarding minor's rash, a doctor diagnosed it as resulting from a fungal infection and prescribed an antibiotic. The hospital drained and bandaged the sores. Mother was instructed to keep everything clean at home and not to let minor share bedding or clothes with others. Minor's cut was sutured and mother was instructed to keep the wound clean, though apparently she was not given any instructions for removal of the stitches, and mother was under the impression that they would dissolve. Through a series of phone calls, SSA determined that, in fact, mother needed to take minor back in to have his stitches removed by July 29, 2015.

On August 12, 2015, SSA informed mother that she needed to take minor back to CHOC to have the stitches removed. By August 18, she still had not done so, nor had she initiated any immunizations as she was supposed to do, so SSA gave her a 24-hour ultimatum to get both done. On August 26, 2015, with mother having gone radio silent for the prior week, SSA and Santa Ana Police officers made an unannounced visit to the home. Mother was placed under arrest pursuant to an arrest warrant for violating the terms of her probation by failing to enroll in a batterer's treatment program. Minor

5

was placed in protective custody at Orangewood Children and Family Center. SSA informed Orangewood that minor's stitches needed removal, and also about the rash, though by that time the rash had mostly cleared up.

SSA interviewed mother regarding the fight with her sister mentioned in the petition. Mother reported that she had minor and a plate of food in her hands when her sister shoved her hand in mother's face. Mother put minor and the food down and proceeded to throw her sister to the ground, at which point mother walked away.

Regarding mother's substance abuse problem, mother's sister reported that mother would sometimes use drugs and disappear for days at a time, leaving the children under the supervision of the other adults in the house. Mother stated that when she left, she would leave the children in the care of grandmother and provide food and money for them. Grandmother confirmed this account.

On August 31, 2015, the court ordered minor detained.

In a subsequent report, SSA recommended offering reunification services to mother, stating, "The prognosis of reunification for this family is fair. The mother has demonstrated the ability to appropriately care for her children at a young age, when not using drugs. Intensive services, such as drug treatment and grief counseling are imminently important for the continued well-being of the child." SSA recommended a case plan that included general counseling, domestic violence/batterer's treatment counseling, a parenting class, substance abuse counseling, drug testing, and Narcotics Anonymous. Regarding incarceration, the case plan stated, "While incarcerated, you will attend, participate in, and show progress in counseling/parenting classes/substance abuse treatment/vocation training program *to the extent available within the institution*." (Italics added.) Mother was granted twice weekly visits with minor.

At the jurisdictional hearing on September 28, 2015, the court found the allegations of the petition to be true and declared minor a dependent of the court. The

6

court adopted SSA's recommended case plan. Minor was placed with a maternal aunt and uncle.

In anticipation of the six-month review hearing, SSA prepared a report on March 30, 2016, in which it recommended terminating reunification services. SSA reported that mother had only minimal compliance with her case plan. During the first three months of her reunification services, mother had missed all of her drug tests. She also failed to enroll in any of the classes required by her case plan. And her visitation with minor during this period was consistent through December of 2015, but became sporadic leading up to the arrest in January 2016.

Mother was arrested on a third probation violation on January 9, 2016. She was sentenced to 16 months but expected to serve eight months, with an estimated release date of August 25, 2016.

Being sent to jail marked a significant turning point for mother, as she began to make significant progress on her case plan. As of April 20, 2016, mother had completed 33 hours in GED (General Education Development) classes, 15 hours of parenting classes, and 21 hours of substance abuse classes, and was still active in all three. Mother was attending 12-step Narcotics Anonymous (N.A.) classes to the extent she was able, and a new class called "Thinking for Change," which was a small group counseling class to address personal issues and bad behavior. Mother was working in the jail from 2:00 p.m. to 6:00 p.m. doing food preparation. Mother reported that she had visited with the children and that minor had said "I love you mommy" for the first time in their last visit.

Meanwhile, minor was doing well in the household of his maternal aunt and uncle. The aunt and uncle indicated a desire to adopt minor if reunification with mother were to fail.

Mother contested the recommendation, and an evidentiary hearing was held.

7

Ultimately, the court sided with SSA, terminated reunification services, and set a .26 hearing. The court described mother's progress while out of custody as "minimal" and "hollow." The court described mother's visitation as "strikingly sporadic." The court noted, however, that while in custody, "mother has taken advantage of every service . . . available to her, and that certainly is to be commended." The court also "emphathize[d] with mother for a variety of reasons, her youth, the loss that she has suffered in her life." Nonetheless, the court felt "constrained by an evaluation of the . . . statutory and case law . . . ."

## DISCUSSION

Welfare and Institutions Code section 366.21, subdivision (e)(3), provides, "If the child was under three years of age on the date of the initial removal . . . , and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child . . . may be returned to his or her parent or legal guardian within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing."

This statute presents an awkward two step analysis. First, the court must determine whether the parent "failed to participate regularly and make substantive progress in a court-ordered treatment plan . . . ." (§ 366.21, subd. (e)(3).) If so, the court may terminate reunification services and schedule a .26 hearing *unless* the court finds "a substantial probability that the child . . . may be returned . . . within six months," in which case the court sets a 12-month permanency hearing. (§ 366.21, subd. (e)(3).) We have described this second step as inquiring "whether there is a strong likelihood of a

8

*possibility* of return . . . ." (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 181.)  It requires, in other words, a probability of a possibility.

The parties' initial briefing in this matter focused entirely on the second step, and for good reason:  both sides agree the court employed the wrong standard.  Rather than inquiring about a probability that the child "may" be returned, the court found no substantial probability that the child "will" be returned.  That is the standard to be employed at the 12-month permanency hearing, not the six-month review hearing. (§ 366.21, subd. (g)(1).)  The parties' arguments then focused on whether that error was prejudicial.

We asked the parties to provide supplemental briefing on a more fundamental issue:  whether the court erred in finding "by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e)(3).)  This issue is more fundamental in the technical sense that it is the first step in the statutory analysis, but also in the more substantive sense that if the court erred on this step, mother was entitled to another six months of reunification services.  Contrast this with the error the parties focused on, which, even if technically prejudicial, would simply result in the court modifying its analysis at the six-month review hearing.

Resolving the issue before us requires us to interpret what it means "to participate regularly and make substantive progress in a court-ordered treatment plan . . . ." (§ 366.21, subd. (e)(3).)  We begin by noting that the statute does not specify any particular quantum of participation; it does not require perfect participation, nor does it even say the regular participation must span the entire period of reunification services. However, the Legislature has offered a few guideposts to help us interpret it.

First, to terminate reunification services, the court must find a failure to regularly participate *by clear and convincing evidence*.  This relatively heavy burden suggests the lack of participation must be fairly stark.

9

Second, in the year 2000 the Legislature amended section 366.21, subdivision (e)(3) to add the requirement of substantive progress. (Stats. 1999, ch. 399, § 2.) The prior version of the statute required a finding that "the parent failed to participate regularly in any court-ordered treatment plan . . . ." Effective in 2000, the statute added "and make substantive progress" in the treatment plan. The legislative history of this amendment indicates a strong shift towards emphasizing substantive progress over quantitative participation: "'This bill sends a message to parents that attendance in court ordered programs is not enough - they need to learn how to correct their problems and learn proper parenting skills.' [¶] The author notes that mere 'participation' in court-ordered treatment programs does not necessarily mean that the parent is adequately addressing the problems that led to the abuse or neglect of the child and the court's order to remove the child from that parent's home for fear for the child's safety." (Sen. Com. on Judiciary, 3d reading Analysis of Sen. Bill No. 1226 (1999-2000 Reg. Sess.) as amended Aug. 19, 1999.) The legislative analysis went on to note that "this bill 'gives judges guidance to interpret the language [of current law] requiring parents to 'regularly participate in court-ordered treatment program.'" (*Ibid.*) In other words, the regularity of the participation must be assessed with an eye towards the substantive progress that has been made. A popular treatise has described the regular-participation and substantive-progress requirements as "two related, but independent requirements." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2016) § 2.152[5][b], p. 2-548.) This is correct in the sense that one could have perfect participation (e.g. by attending drug treatment classes and making every drug test), but a lack of substantive progress can lead to termination of reunification services (e.g. every drug test came back positive). But they are related, in the sense that if a parent truly makes substantive progress, a certain amount of irregularity in participation can be excused.

10

Here, the evidence shows mother participated regularly in her court ordered treatment plan, albeit only for the latter three months of the relevant time period. As the court noted, once incarcerated, mother took advantage of every service available to her. And this was all her case plan required. It stated, "While incarcerated, you will attend, participate in, and show progress in counseling/parenting classes/substance abuse treatment/vocation training program *to the extent available within the institution*." (Italics added.) By all accounts, for the latter three months of the reunification period, her participation was perfect.

Regarding substantive progress, there was no clear and convincing evidence of a lack of substantive progress. The court, somewhat reluctantly, latched onto one particular bit of mother's testimony in finding a lack of substantive progress. At trial, the court asked mother to recite the second step of N.A. She was unable to recite the correct step:

"The Court: You're involved in A.A./N.A.

"[Mother]: Correct.

"The Court: And have you been involved in it previously before this most recent incarceration?

"[Mother]: Not as involved as in this time, no.

"The Court: Have you been involved?

"[Mother]: Yes.

"The Court: And are you working your program?

"[Mother]: Yes, I am.

"The Court: And what step are you on?

"[Mother]: I am on my second step.

"The Court: Okay. What's the first step?

"[Mother]: I just started my steps when I started working with this girl from my meetings, and this is all new to me.

11

"The Court:  Do you know the first step?

"[Mother]:  I don't know.

"The Court:  Do you know the step that you're on now, what it involves?

"[Mother]:  It involves me — it involves me writing down — I forgot what word it is.

"The Court:  You don't have to use the correct words.  You can just tell me.

"[Mother]:  Okay.  Well, it involves me writing down like my — it involves me writing down like —

"The Court:  Let me ask a different — this in a different way.  Are you doing that second step?

"[Mother]:  I am.

"The Court:  Are you writing things down?

"[Mother]:  I am.

"The Court:  What are you writing down?"

"[Mother]:  I'm writing down like how I actually got to my addiction."

In rendering its decision, the court stated, "[T]he court invited . . . mother when she was testifying to tell me not as a recitation of a, quote, unquote, black letter — steps for the 12-step program, but just to tell me what she was doing and what she — her response, because the court is sensitive to the facts that there may be limitations in terms of memory, may be limitation in terms of nerves that when somebody testifies, that the stakes are quite high, that sometimes that can cause a person to freeze at the stick, as it were, and not be as forthcoming as they would in more casual conversation without the pressure of events.  [¶]  But the court, in looking at mother's substantive answers and going beyond, again, her ability to recite a black latter recitation of the steps, that her response did not seem consistent with the 12-step program, that the — and what is — what is at core here is, is there . . . an engagement?  Is this participation, is it substantive?  Does it represent substantive progress?"

12

However, the evidence showed she only attended a grand total of *three* N.A. meetings. And that was not because she was disinterested, but because the meetings were not made available in jail very often, and even when they were available, they often conflicted with other classes or work. She testified that she attended every N.A. meeting that she could. The burden was on SSA to prove a lack of substantive progress. (See § 366.21, subd. (e)(1) [social worker has burden to demonstrate return of child would be detrimental; failure to participate regularly and make substantive progress on court-ordered treatment programs is prima facie evidence of detriment].) Given this record, the failure to recite the steps of a 12-step program was not clear and convincing evidence of a lack of substantive progress.

Beyond that, there was evidence of substantive progress. Mother's "Thinking for Change" and GED classes, for example, were not required by the case plan. She was going above and beyond the call of duty, suggesting a real commitment to reform. She completed the in-custody parenting program twice and reported utilizing the techniques from those classes in her visitation with minor. The social worker testified at trial and agreed that mother has "taken . . . something positive away from the parenting class." And mother had at least recognized as a result of her drug treatment classes that the "most important thing is that you got to want to be sober. You got to want that change." She testified she does want it. Time will tell whether she sticks to that commitment, but she has done enough at this point to be given additional reunification services.

We also deem it important to bear in mind the context in which this case arose; to view the forest from the trees. While mother undoubtedly has a serious problem with substance abuse that needs to be addressed, there was never any evidence of significant harm to minor. Because mother lived with grandmother and her sister Olga, who by all accounts were responsible adults, when mother would use drugs, she would leave the house and leave minor with grandmother and Olga, who would ensure proper care for minor. The only actual harm present in the record was a cut finger and a diaper rash, maladies that all parents are guilty of exposing their children to. And even then, mother had those injuries treated by a doctor immediately. The stitches and immunizations were also legitimate concerns, but they were taken care of at the time of the initial detention. In reaching a stage in this proceeding where mother's parental rights would presumptively be terminated, we worry that this case has built up a momentum out of keeping with the problems that gave rise to it. Substance abuse is not, in itself, a sufficient reason to take a person's child away. (*See* Welf. & Inst. Code, § 300, subd. (b)(1) [jurisdiction proper where "[t]he child has suffered, or there is a substantial risk that the child will suffer, *serious physical harm or illness*, as a result of . . . the inability of his or her parent . . . to provide regular care for the child due to the parent's . . . substance abuse"], italics added.) Nor is being incarcerated sufficient, in and of itself. (Welf. & Inst. Code, § 300, subd. (g)(1) [jurisdiction proper where "the child's parent has been incarcerated or institutionalized *and cannot arrange for the care of the child*"], italics added.) We recognize it is beyond the scope of this proceeding to revisit the jurisdictional findings that led to the present circumstances, but we urge the trial court to keep this context in mind as the case progresses.

## DISPOSITION

Let a peremtory writ of mandate issue directing the trial court to vacate its order of May 23, 2016, terminating reunification services and setting a .26 hearing, and to issue a new order extending reunification services until a 12-month permanency hearing. (§ 366.21, subd. (f).) In the interests of justice, this opinion is final 10 days after its filing. (Cal. Rules of Court, rule 8.490(b)(2)(A).)


IKOLA, J.

WE CONCUR:


ARONSON, ACTING P. J.


FYBEL, J.

15